WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Lisa Divito Weber,                 )
Individually, as Personal          )
Representative of the Estate       )
of Norman Scott Weber,             )     No. CIV 06-02779 PHX RCB
Deceased, and next-friend of       )
Brittany M. Weber and Whittney)          O R D E R
Nicole Weber, minor children       )
of Decedent,                       )
                                   )
            Plaintiff,             )
                                   )
            vs.                    )
                                   )
Hartford Life and Accident         )
Insurance Company, a               )
Connecticut corporation,           )
                                   )
            Defendant.             )
_____)

    Currently pending before the court is a motion for summary judgment (doc. 18) pursuant to Fed. R. Civ. P. 56 by defendant, Hartford Life and Accident Insurance Company ("Hartford") on the grounds that the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 10001-1461 ("ERISA") preempts plaintiff's claims herein. Also pending before the court is plaintiff's "Motion to Strike Defendant's Evidence Supporting Motion for Summary

Judgment"[1] (doc. 39).   Although Hartford did not request oral

argument as to its summary judgment motion, plaintiff did request

oral argument as to her motion to strike.   Given the parties'

submission of fairly comprehensive "memoranda . . . and evidence in

support of their respective positions[,]" the court finds that both

motions are suitable for resolution without oral argument.   See

Mahon v. Credit Bur. of Placer County, Inc., 171 F.3d 1197, 1200

(9th Cir. 1999).   Accordingly, the court denies plaintiff's request

for oral argument.

### *Background*

Following Norman Weber's death from carbon monoxide poisoning,

his wife, plaintiff Lisa DiVito Weber, submitted a claim to

Hartford for accidental death benefits.   Plaintiff sought those

benefits pursuant to a group accidental death and dismemberment

policy ("the policy" or "the AD&D policy") which Hartford had

issued to Mr. Weber's employer, W.W. Williams Company ("Williams"),

and under which plaintiff was the beneficiary.   Mr. Weber was

insured under that policy at the time of his death.   Following an

investigation, Hartford denied plaintiff's claim relying upon the

policy's exclusion for deaths caused by suicide.

Plaintiff vigorously contends that her husband's death was not

a suicide.   Thus, believing that Hartford had improperly denied her

benefits under the policy, originally plaintiff commenced this

action in Arizona Superior Court, Maricopa County.   Plaintiff's

claims sound primarily in breach of contract, although she also

alleges breach of fiduciary duty, and breach of unspecified

---

[1]      This is actually plaintiff's "amended" motion to strike, correcting her
previously filed motion to strike (doc. 38).

statutory duties.  Hartford timely removed this action, asserting

federal question jurisdiction.  More specifically, Hartford

contends that ERISA completely preempts plaintiff's state law

causes of action.  Alternatively, Hartford contends that the court

has jurisdiction pursuant to 28 U.S.C. § 1332 because there is

diversity of citizenship between the parties and the amount in

controversy exceeds $75,000.00.

***Discussion***

***I.  Motion to Strike***

Before addressing Hartford's summary judgment motion, to

clarify the state of the record, the court must first address

plaintiff's motion to strike.

Approximately two and a half weeks after filing her

response to Hartford's summary judgment motion, plaintiff filed a

separate motion "to strike hearsay and other inadmissible evidence

contained in Defendant's Statement of Facts [("DSOF")] and exhibits

thereto."  Mot. (doc. 39) at 1.  Hartford responds that the court

should deny that motion on both procedural and substantive grounds.

Procedurally, it is "improper and untimely" under the Local Rules.

Resp. (doc. 44) at 1:16-17.  Substantively, according to Hartford,

"plaintiff has completely failed to discredit or invalidate any of

[its] evidence."  Id. at 1:18-19.

Plaintiff directs the bulk of her reply to Hartford's

procedural objections, which she urges this court to "overlook[.]"

Reply (doc. 50) at 3:4.  In making this argument, plaintiff claims

that Hartford was not prejudiced by her delay in filing this motion

to strike.  Substantively, in essence plaintiff counters that the

court should deny Hartford's summary judgment motion because that

motion is not supported by admissible evidence.

**_A.  Propriety/Timeliness?_**

Hartford invokes two Local Rules in responding to plaintiff's motion to strike.  First, although not directly responsive to that motion, Hartford relies upon LRCiv 56.1(b).  That Rule requires a party opposing summary judgment such as plaintiff Weber to provide, among other things:

> a [separate] statement, . . . . setting forth . . . for each paragraph of the moving party's separate statement of facts, a correspondingly numbered paragraph indicating whether the party disputes the statement of facts set forth in that paragraph[.]

LRCiv 56.1(b).  That Rule further provides that "[e]ach numbered paragraph of the statement of facts set forth in the moving party's separate statement of facts *shall,* unless otherwise ordered, *be deemed admitted* for purposes of the motion for summary judgment if not specifically controverted by a correspondingly numbered paragraph in the opposing party's separate statement of facts."  Id. (emphasis added).

Hartford claims that "plaintiff utterly ignored" that Local Rule by not filing a separate statement of facts in compliance therewith.  Resp. (doc. 44) at 2:13.  Hence, Hartford maintains that the court should deem admitted its separate statement of facts.

It is true that plaintiff's initial statement of facts ("PSOF")[2] did not conform to LRCiv 56.1(b) in that she did not

---

[2]     On December 14, 2007, plaintiff filed her responsive memorandum (doc. 32) and statement of facts (doc. 33).  On December 20, 2007, however, she expressly withdrew both of those filings, explaining that the memorandum was a "misnamed and misdirected 'draft' document," and directing the court and Hartford to her amended

indicate whether or not she disputed any of the facts in the DSOF. Instead, she simply set forth her own 45 paragraph SOF.  Thus, the court could deem admitted Hartford's 35 paragraph separate SOF. "However, given the phrase, 'unless otherwise ordered,' the court finds that it has the discretion, but is not required, to deem the uncontroverted facts admitted."  <u>Huynh v. J.P. Morgan Chase & Co.</u>, 2008 WL 2789532, at *5 (D.Ariz. 2008) (internal quotation marks and citation omitted).

Exercising that discretion, the court will not deem admitted Hartford's SOF because plaintiff did eventually file a SOF wherein she noted her objections, in correspondingly numbered paragraphs, to Hartford's SOF.  <u>See</u> PSOF (doc. 49).[3]  Obviously, it would have been preferable for plaintiff to have fully complied with LRCiv 56.1(b) from the outset.  The court sees no prejudice to Hartford, however; in the future, it will not overlook the rule's requirements.

Hartford, more properly, also is relying upon LRCiv 7.2 in responding to plaintiff's motion to strike.  Effective December 1, 2007, a subsection pertaining expressly to motions to strike was added to that Rule.  Among other things, LRCiv 7.2(m)(2) requires that a party objecting to the admission of evidence offered in support of a summary judgment motion present those objections "in the party's response to [the] []other party's separate statement of material facts[.]" LRCiv 7.2(m)(2).  That Rule is explicit: such

---

response (doc. 35) and accompanying SOF (doc. 36) filed that same day.  Doc. 34 at 1:22; and 25-26.

[3]      Hereinafter all references to PSOF shall be read as referring to this amended version (doc. 49).

evidentiary objections shall "not [be] in a separate motion to strike or other separate filing."  Id.

Despite the foregoing, obviously plaintiff did file a separate motion to strike.  Once again, the court will be lenient in overlooking this procedural irregularity.  The court will do so for two reasons.  First, as plaintiff is quick to point out, this particular subsection of LRCiv 7.2 only became effective less than a month prior to the filing of her motion to strike.  Second, under all the circumstances the court finds that there is no prejudice to Hartford if it considers this motion on the merits. In short, the court will overlook Hartford's procedural objections to plaintiffs' motion to strike.

### B.  Business Record Exception

Turning to the merits, plaintiff is seeking to strike in its entirety exhibit C to DSOF (doc. 19), which contains part of Hartford's policy file.  Plaintiff also is seeking to strike certain documents contained in Hartford's claims file -- the "Glendale Police Department Offense Report[]"[4] (DSOF (doc. 19), exh. B thereto at HLAWCF00015 - HLAWCF00022[5]); the Medical Examiner Report (id. at HLAWCF0032 - HLAWCF00040; and Hartford's denial of claim letter (id. at HLAWCF00005-HLAWCF00007).  Primarily, plaintiff objects to these documents based upon lack of foundation and because supposedly they are replete with inadmissible hearsay.

Hartford invokes Fed. R. Evid. 803(6), the business record

---

[4]     Mot. (doc. 39) at 3:9.5.

[5]     In her motion plaintiff refers only to the "Glendale Police Offense Reports" in exhibit B to DSOF; she does not specify page numbers.  In addition to documents explicitly labeled as such, that exhibit includes five pages entitled "Glendale Police Department Supplementary[.]"  Presumably plaintiff's motion to strike includes those five pages as well.

exception to the hearsay rule, to argue that both its claim and

policy files are properly admissible on this motion.  Then,

Hartford relies upon the affidavit of a Hartford employee to

authenticate those files, and thus overcome plaintiff's objection

to lack of foundation.  See Resp. (doc. 44) at 3.

Plaintiff's motion to strike the police and medical examiners'

reports, as well as the denial of claim letter, need not detain the

court for long.  In arguing that the court should strike those

particular documents, plaintiff vehemently disputes the cause of

Mr. Weber's death.  In contrast to what those documents indicate,

plaintiff claims that Weber's death was accidental and not a

suicide.  At this juncture, however, the cause of death is simply

irrelevant.  Accordingly, the court denies plaintiff's motion to

strike the documents enumerated above.  Moreover, as more fully

discussed below, because those records were part of Hartford's

claim file they would be admissible, in any event, as business

records.

Federal Rule of Evidence 803(6) provides in relevant part:

> The following are not excluded by the hearsay rule,
> even though the declarant is available as a witness:
>                       . . .
> A memorandum, report, record, or data compilation,
> in any form, of acts, events, conditions, opinions,
> or diagnoses, made at or near the time by, or from
> information transmitted by, a person with knowledge,
> if kept in the course of a regularly conducted business
> activity, and if it was the regular practice of that
> business activity to make the memorandum, report,
> record or data compilation, all as shown by the
> testimony of the custodian or other qualified witness,
> . . . . , unless the source of information or the method
> or circumstances of preparation indicate lack of
> trustworthiness.

Fed. R. Evid. 803(6).  "This [C]ircuit has held that records a

business receives from others are admissible under [that] Rule
. . . when those records are kept in the regular course of that
business, relied upon by that business, and where that business has
a substantial interest in the accuracy of the records." MRT
Construction Inc. v. Hardrives, Inc., 158 F.3d 478, 483 (9th Cir.
1998) (citation omitted).  That standard is met here.

    The averments by Hartford employee and "Team Leader," Kenneth
Malley, who is "familiar with the different files maintained by
. . . Hartford," establishes that he is a "qualified witness" under
Rule 803(6).  Further, the fact that "Hartford maintains policy
files for each of its group policies[,]" and "claims files for each
claim that is submitted to it[,]" along with the fact that those
files "consist entirely of documents prepared or received by
[Hartford] personnel . . . in the ordinary course of business[,]"
Resp. (doc. 42), exh. A (doc. 42-2) at 2, ¶¶ 4; 5; and 9, supports
a finding that those files were "kept in the course of [Hartford's]
regularly conducted business activity[]" under Rule 803(6).

    Additionally, although Mr. Malley does not expressly aver that
Hartford relies upon these files, viewing his affidavit as a whole,
that is the obvious and only inference which can be drawn.
Therefore, the court finds that Hartford's policy and claims files
are properly admissible as business records.  See Deland v. Old
Republic Life Insurance Co., 758 F.2d 1331, 1338 (9th Cir. 1985)
(correspondence between two insurers and administrator of a
disability plan regarding coverage for worker's disability claim
admissible under Rule 803(6) as a business record where insurer
received such correspondence in the ordinary course of its business
and it became part of the worker's file).  As an aside, the court

observes that a careful reading of plaintiff's motion shows, as Hartford points out, that she is actually arguing about how the court should interpret the proffered evidence and the inferences which should be drawn from it.  The court agrees with Hartford that those arguments are more properly brought in responding to Hartford's summary judgment motion, as opposed to being made as part of a motion to strike.  For the reasons set forth above, the court denies plaintiff's motion to strike (doc. 39).

There is one final issue before turning to Hartford's summary judgment motion, and that is Hartford's request for its "attorneys' fees and costs incurred in responding to this motion[]" to strike.  See Resp. (doc. 44) at 5:10-12.  Hartford is seeking this relief based solely upon its view that that motion to strike was "patently improper under the rules[.]" Id. at 5:10. Particularly because when plaintiff filed this motion, LR 7.2 as it pertains to motions to strike, had only recently been amended, the court does not find that that motion was "patently improper." Thus, it denies Hartford's request for attorneys' fees and costs incurred in responding to that motion.  Nonetheless, the court stresses that as a lawyer admitted to practice in this district court, plaintiff's counsel is under a continuing obligation to keep apprised of current changes in the law, including changes in the Local Rules.

**II.  Summary Judgment.**

  **A.  Governing Legal Standards**

Pursuant to Fed.R.Civ.P. 56(c), a party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." It is beyond dispute that "[t]he moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact." Horphag Research Ltd. v. Garcia, 475 F.3d 1029, 1035 (9th Cir.2007) (citation omitted). "Once the moving party meets its initial burden, . . . , the burden shifts to the nonmoving party to set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal quotation marks and citations omitted).  This "[e]vidence must be concrete and cannot rely on mere speculation, conjecture, or fantasy." Bates v. Clark County, 2006 WL 3308214, at * 2 (D.Nev. Nov.13, 2006) (internal quotation marks and citation omitted). Similarly, a mere scintilla of evidence is not sufficient to defeat a properly supported motion for summary judgment; instead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" Fazio v. City & County of San Francisco, 125 F.3d 1328, 1331 (9th Cir.1997) (quoting Anderson, 477 U.S. at 249, 252). Thus, in opposing a summary judgment motion it is not enough to simply show that there is some metaphysical doubt as to the material facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted).

   By the same token though, when assessing the record to determine whether there is a genuine issue for trial," the court must "view the evidence in the light most favorable to the

nonmoving party, drawing all reasonable inferences in h[er] favor."

Horphag, 475 F.3d at 1035 (citation omitted). "Nevertheless,

inferences are not drawn out of the air, and it is the opposing

party's obligation to produce a factual predicate from which the

inference may be drawn." Yang v. Peoples Benefit Ins. Co., 2007 WL

1555749, at *7 (E.D.Cal. May 25, 2007) (citations omitted).  On a

summary judgment motion, the court may not make credibility

determinations; nor may it weigh conflicting evidence. See

Anderson, 477 U.S. at 255.  Thus, as framed by the Supreme Court,

the ultimate question on a summary judgment motion is whether the

evidence "presents a sufficient disagreement to require submission

to a jury or whether it is so one-sided that one party must prevail

as a matter of law." Id. at 251-52.  With these general principles

firmly in mind, the court will now consider whether, as Hartford

contends, summary judgment is proper on the issue of ERISA

preemption.

**_B.  ERISA Preemption_**

The Ninth Circuit has "repeatedly emphasized that ERISA

contains one of the broadest preemption clauses ever enacted by

Congress." Providence Health Plan v. McDowell, 385 F.3d 1168, 1175

(9th Cir. 2004) (internal quotation marks and citations omitted)

(Thomas, J., dissenting from denial of rehearing en banc).  The

scope of ERISA preemption "is deliberately broad as a means to

bring exclusively within federal control the regulation of pension

and welfare plans." Gelow v. Central Pacific Mortg. Corp., 2008 WL

436935, at *6 (E.D.Cal. 2008) (citing Pilot Life Ins. Co. v.

Dedeaux, 481 U.S. 41, 45-46, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)).

Starting from the position that the policy is an "employee

welfare benefit plan," Hartford argues that as such ERISA "wholly preempts [plaintiff's] state law causes of action[.]" Mot. (doc. 18) at 1:21. Therefore, Hartford contends that it is entitled to summary judgment as to those causes of action.

Plaintiff's response is two-fold. First, she contends that the policy is an "[e]ntrepreneurial [p]lan," and thus "not [s]ubject to ERISA [p]reemption[.]" Resp. (doc. 35) at 6:2-3. Second, plaintiff contends that the policy is a "voluntary[,] employee-paid excess benefit plan" for which Williams, as the employer, "merely acted as a 'pass through' deducting premiums," and "provid[ing] ministerial functions[.]" Id. at 6:23; and at 3:14 and 16-17. On that basis, plaintiff contends that the policy is outside the scope of ERISA because it falls within the Department of Labor's "safe harbor" regulation, 29 C.F.R. § 2510.3-1(j). Hartford counters that plaintiff cannot rely upon the safe harbor because Williams "[e]ndorsed [t]he [p]lan[]" by engaging in a number of activities which will be more fully discussed below. Mot. (doc. 18) at 8:9.

The court will address these arguments in reverse order. It will first consider whether, as plaintiff contends, the policy falls within the safe harbor regulation. If Hartford prevails, i.e. the court finds that the policy falls outside of the safe harbor exception, that does not end the court's inquiry. The court still must determine whether the policy is an "employee welfare benefit plan" within the meaning of 29 U.S.C. § 1002(1). See Anderson v. UNUM Provident Corp., 369 F.3d 1257, 1263 n.2 (11th Cir. 2004) (citation omitted) ("[A] plan that falls outside of the safe harbor exception does not necessarily fall within the

jurisdiction of ERISA."); <u>Johnson v. Watts Regulator Co.</u>, 63 F.3d 1129, 1133 (1st Cir. 1995) (citing, *inter alia*, <u>Qualls v. Blue Cross of Cal., Inc.</u>, 22 F.3d 839, 843 (9th Cir. 1994)) (emphasis added) ("Failure to fulfill any one of the . . . criteria listed in the [safe harbor] regulation, . . . , closes the safe harbor and exposes a group insurance program, *it if otherwise qualifies as an ERISA program*, to the strictures of the Act."); and <u>Grimo v. Blue Cross/Blue Shield of Vermont</u>, 34 F.3d 148, 152 (2nd Cir. 1994) (citation omitted) (emphasis added) ("Of course, a plan that does not meet the . . . requirements of this [safe harbor] regulation *must still be* an 'employee welfare benefit program' under 29 U.S.C. § 1002(1) to be covered by ERISA.")  If the Hartford policy qualifies as an "employee welfare benefit plan," then summary judgment in Hartford's favor will be proper.  Conversely, if the policy does not meet that statutory definition, ERISA preemption will not come into play here.

### 1. "Safe Harbor"

For plaintiff to prevail on her argument that the policy comes within ambit of the safe harbor regulation, she must "prove that the p[olicy] meets [the] four separate requirements of th[at] regulation[.]" <u>See Sgro v. Danone Waters of North America, Inc.</u>, 2008 WL 2598936, at *1 (9th Cir. 2008).  Those four requirements are:

> (1) No contributions are made by an employer or employee organization;
>
> (2) Participation in the program is completely voluntary for employees or members;
>
> (3) The sole functions of the employer or employee or with respect to the program are, *without endorsing the program*, to permit the insurer

to publicize the program to employees or members,
to collect premiums through payroll deductions
or dues checkoffs and to remit them
to the insurer; and

(4) The employer or employee organization receives
no consideration in the form of cash or otherwise
in connection with the program, other than
reasonable compensation, excluding any profit, for
administrative services actually rendered in
connection with payroll deductions or dues checkoffs.

Stuart v. UNUM Life Ins. Co. of America, 217 F.3d 1145, 1149 (9th Cir. 2000) (quoting 29 C.F.R. § 2510.3-1(j)) (other citation omitted) (emphasis added).   In the Ninth Circuit, "*each* of these criteria must be met before an insurance plan can be excluded from ERISA coverage."   Rubin v. Guardian Life Ins. Co. of America, 174 F.Supp.2d 1111, 1117 (D.Or. 2001) (citing cases) (emphasis added).

By focusing exclusively upon plaintiff's supposed inability to establish the third element[6], the court finds that Hartford is conceding that the other three safe harbor criteria are met here. In particular, Mr. Weber's employer, Williams, did not make any contributions towards the policy premiums; participation in the policy was "completely voluntary" for Williams' employees; and Williams did not receive any consideration forbidden by 29 C.F.R. § 2510.3-1(j)(4).   In light of the foregoing, the court, like the parties, will confine its analysis to the third safe harbor element – endorsement.

If an employer's level of involvement with a given policy rises to the level of endorsement, the third safe harbor criteria is not satisfied.   In accordance with 29 C.F.R. § 2510.3-1(j)(3), an employer may "perform certain duties and still remain within the

---

[6]   See Mot. (doc. 18) at 9:4-5 ("The Safe Harbor exemption does not apply here because the third element of the test is not met.")

safe harbor of the regulation." <u>Ames v. Jefferson Pilot Financial Co.</u>, 515 F.Supp.2d 1050, 1056 (D.Ariz. 2007).  Thus, "[a]s the regulation itself indicates, remaining neutral does not require an employer to build a moat around a program or to separate itself from all aspects of program administration." <u>Rubin</u>, 174 F.Supp.2d at 1118 (internal quotations and citations omitted).  So, for example, as the regulation itself states, "[a]n employer may permit the insurer to publicize the program and may collect premium payments through payroll deductions and remit them to the insurer[,]" and still not be deemed to have endorsed the program within the meaning of the safe harbor regulation. <u>Ames</u>, 515 F.Supp.2d at 1056 (citation omitted).  Likewise, "[a]n employer does not endorse an insurance program as long as it performs no more than ministerial administrative tasks that do not constitute abandonment of its neutrality with regard to its operation of the insurance program."  <u>Id.</u> at 1056-1057 (citing <u>Zavora v. Paul Revere Life Ins. Co.</u>, 145 F.3d 1118, 1122 (9th Cir. 1998)).

On the other hand, "when an employer purposes to do more, and takes substantial steps in that direction, . . . it offends the ideal of employer neutrality and brings ERISA into the picture." <u>Rubin</u>, 174 F.Supp.2d at 1118 (internal quotation marks and citations omitted).  "An employer . . . will be said to have endorsed a program within the purview of the . . . safe harbor regulation if, in light of all the surrounding facts and circumstances, an objectively reasonable employee would conclude on the basis of [its] actions that the [employer] . . . had not merely facilitated the program's availability but had exercised control over it or made it appear to be part and parcel of [its] own

benefit package." <u>Pierson v. Continental Casualty Co.</u>, 2000 WL 1879895, at *6 (C.D.Cal. 2000) (internal quotation marks and citations omitted); <u>see also</u> Dep't. of Labor Opinion No. 94-26A (1994) (employer's communications with its employees regarding group insurance program will constitute an endorsement for purposes of § 2510.3-1(j)(3) if, together with other employer activities, it leads reasonable employees to believe that the program has been established or maintained by the employer).[7]

Based upon a culmination of factors, Hartford vehemently contends that Williams crossed the line of employer neutrality to endorsing the policy.  Broadly stated, those activities by Williams fall into four categories: (1) negotiating and procuring the policy; (2) maintaining and administrating the policy; (3) negotiating lower rates in exchange for increasing solicitation efforts; and (4) filing annual reports which the Internal Revenue Code and ERISA require.  Given these activities, detailed below, Hartford maintains that plaintiff is not entitled to rely upon the safe harbor regulation because she cannot satisfy the third element of that regulation, *i.e.* that Williams did not endorse the Hartford policy.

Plaintiff responds by stressing the voluntary nature of the policy, and the fact that the employees paid the premiums -- not the employer.  Plaintiff's reliance upon those two factors, as Hartford is quick to point out, is not germane to the endorsement issue.  As set forth at the outset, to invoke ERISA's safe harbor

---

[7]    The court recognizes that Department of Labor opinion letters are not controlling; however, they "do constitute a body of experience and informed judgment to which courts and litigants may properly resort to for guidance." <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 139-40, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

regulation, it is not enough to show voluntary participation and a lack of employer contributions.  Those are only two of the criteria necessary to invoke the safe harbor exemption.  Rather, a plaintiff who wants to escape ERISA coverage based upon the safe harbor regulation must also show, *inter alia*, that the employer did not endorse the policy.

In an effort to show lack of endorsement, plaintiff Weber relies, *inter alia*, upon the affidavit of Williams' Vice President of Human Resources who avers that Williams "merely acted as a 'pass through[,]' . . . deducting premiums from the employee's [sic] pay on a monthly basis and remitting payment to . . . Hartford."  PSOF (doc. 49), exh. 1 (doc. 36-2[8]) thereto (Turley Aff.) at ¶ 3.  This particular averment, as Hartford notes however, is "conclusory, self-serving . . . , [and] lacking detailed facts and any supporting evidence[.]"  See Nilsson v. City of Mesa, 503 F.3d 947, 952 (9th Cir. 2007) (internal quotation marks and citation omitted).  By including the pass through language, this affidavit likewise contains an impermissible legal conclusion.  See In re Roman Catholic Archbishop of Portland in Oregon, 335 B.R. 868, 887 n. 16 (Bankr. D. Or. 2005) (reasoning that "[a] legal conclusion is not a fact admissible in evidence[,]" on a summary judgment motion, the court struck legal conclusion from a supporting declaration).  Accordingly, this affidavit is insufficient to create a genuine issue of material fact on the endorsement issue.  Moreover, as will be seen, there is substantial record proof showing that Williams

---

[8]   This exhibit was actually attached to plaintiff's original SOF. However, because plaintiff did not attach any exhibits to her amended SOF, presumably she is continuing to rely upon the originally provided exhibits.

was far more than a mere conduit or "pass through" for premium payments, and that it greatly exceeded the bounds of employer neutrality.

Plaintiff makes the related contention that Williams provided only "ministerial functions to facilitate employees' participation[;]" thus it cannot be deemed to have endorsed the policy. Resp. (doc. 35) at 3:16-17 (citations omitted). None of the cites following this statement support that assertion, however, and it is not the court's obligation "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotation marks and citations omitted). In fact, none of the cites pertain to "ministerial functions" at all. In any event, it is plaintiff's duty as the "nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." Id. (internal quotation marks and citations omitted). Plaintiff has not done that. What is more, as just noted and as will soon become evident, the record proof shows that Williams performed more than strictly ministerial functions.

In addition to the foregoing, plaintiff claims that the "advertising brochures" and "enrollment forms" "originated" with Hartford, not with Williams. Resp. (doc. 35) at 8:7. Plaintiff adds that those brochures and Hartford's proposals were directed towards Williams' employees and their family members, as opposed to being directed towards Williams as the employer. Even assuming the

record supports plaintiff's version of these events,[9] neither of these factors, standing alone or combined, is sufficient to support a finding that Williams did not endorse the policy given its extensive involvement with many other aspects of the policy as discussed below.

Without citing to the record, plaintiff also claims that the Proposed Plan "dictated responsibility" to Hartford, not Williams, "for soliciting and publicizing coverage among Williams [sic] employees[,]" another factor which from plaintiff's standpoint indicates that Williams did not endorse the policy.  See Resp. (doc. 35) at 4.  A careful review of that Plan reveals, however, that Hartford had a narrowly circumscribed "solicitation" role which consisted of "work[ing] with . . . *Williams* to solicit coverage by developing a customized brochure and enrollment material."  DSOF (doc. 19), exh. C thereto at HLWSP00045. Moreover, in designating whether Williams, Hartford or another entity would be responsible for certain "[a]dministrative [f]unctions[,]" the record unequivocally states that Williams is to perform "[a]*ll* solicitation & sales activity[.]" Id., exh. C thereto at HLWSP00193 (emphasis added).  In light of the foregoing, the record does not support a finding, as plaintiff suggests, that Hartford alone was responsible for soliciting employees and publicizing the policy.  In short, especially when juxtaposed with Hartford's uncontroverted proof, plaintiff has not created a genuine issue of material fact on the issue of endorsement.

---

[9]     There is some ambiguity in the record in terms of enrollment cards versus enrollment forms.  As to the former, the record is clear though that Williams provided its own, which Hartford ultimately approved.  DSOF (doc. 19), exh. C thereto at HLWSP00190.

Indeed, for a host of reasons which it will now outline, the court is convinced that as a matter of law Williams did "endorse" the policy as that term is used in ERISA's safe harbor regulation.

Relying upon a variety of activities by Williams, Hartford maintains that "in light of all the surrounding facts and circumstances, an objectively reasonable employee would conclude on the basis of [its] actions that [Williams] . . . had not merely facilitated the program's availability but had exercised control over it or made it appear to be part and parcel of [its] own benefit package." See Pierson, 2000 WL 1879895, at *6 (internal quotation marks and citations omitted).  The court agrees.

Initially, Hartford points to the fact that after negotiation through an agent, Williams selected Hartford as the group insurer to provide AD&D coverage to Williams' employees and their eligible dependents.  DSOF (doc. 19) at ¶¶ 7-12; and exh. C thereto at HLWSP00205; HLWSP00208; and HLWSP00215.  In addition, Hartford deviated from its standard policy in a number of ways to "customize[]" its policy "to meet the needs of . . . *Williams* and their employees."  Id., exh. C thereto at HLWSP00037; see also id. at ¶ 18; and exh. C thereto at HLWSP00141-89, HLWSP00194-99. Illustrative changes include adding a provision to ensure continuity of coverage from Williams' previous AD&D insurance provider, as well as creating and defining two different eligible classes of employees.  See id. at ¶ 18, and exh. C thereto at HLWSP00197; and DSOF at ¶¶ 14-16, and exh. C thereto at HLWSP00200 and HLWSP00084.  Not only did Williams select Hartford in the first instance, but Williams, as the policyholder, was also responsible for "indicating the coverage desired and effective date[]" before

Hartford would issue the policy.  Id., exh. C thereto at HLWSP00045.

Plaintiff attempts to undermine this proof by suggesting that it is not clear from the cited documents that Williams actually influenced the policy changes.  However, the only reasonable inference which can be drawn from the record as a whole, including the "customized" language in the Proposed Plan, is that Hartford undertook those changes at Williams' behest.  It is not reasonable to conclude otherwise, i.e. that Hartford would voluntarily go to the effort and expense of modifying its standard policy and enrollment cards without at least some prompting by Williams.  Indeed, as noted earlier, the record shows that Hartford had to modify its standard enrollment cards to conform to Williams' desire to have the employee and his/her spouse choose their own benefit limits.  See id. at HLWSP00190 and HLWSP00200.

Even assuming arguendo that the policy modifications were not done at Williams' behest, there are several other factors which weigh heavily in favor of a finding of endorsement here.  Among those facts is that it is settled that an employer, such as Williams, "'who creates by contract with an insurance company a group insurance plan and designates which employees are eligible to enroll in it is outside the safe harbor created by the Department of Labor regulation.'" The Meadows v. Employers Health Insurance, 826 F.Supp. 1225, 1230 (D.Ariz. 1993) (quoting Brundage-Peterson v. Compcare Health Services Ins. Corp., 877 F.2d 509, 511 (7th Cir. 1989)), aff'd on other grounds, 47 F.3d 1006 (9th Cir. 1995). Williams did just that.  It contracted with Hartford to provide a group AD&D policy, and it designated two groups of eligible

employees.

The court is fully cognizant that the employers in both Meadows and Brundage paid the premiums, while Williams did not.  Of primary importance to the Brundage Court, however, was the contractual relationship between the employer and the insurance companies to provide group coverage.  In Brundage, Judge Posner noted that "in addition" the employer "help[ed] defray the employee's insurance cost[]" by paying for the employee's but not the dependent's premiums.  Brundage, 877 F.2d at 511.  Judge Posner continued though: "[F]rom an economic standpoint there is little difference between payment nominally by the employer--which the employer will treat as a cost of employment, causing him to pay a lower wage than otherwise--and payment nominally by the employee."[10]  Id. (emphasis added)  Thus, in this court's opinion, the fact that Williams did not pay the premiums is not dispositive of the endorsement issue.  This is all the more so given Williams' other significant involvement with the policy described herein.

Another significant factor which supports a finding of endorsement in the present case is Williams' role as plan administrator.  This is not a situation where Williams was an administrator in name only.  Rather, "the undisputed facts show that [Williams] participated in the administration of the [Hartford AD&D policy] to a material extent bringing" that policy "outside the scope of . . . [ERISA's] safe harbor."  See Alloco v.

---

[10]    Nominal payment by the employee is exactly what occurred here as evidenced by the affidavit of plaintiff Weber wherein she avers that because the monthly premium was "only $9 per month for a $160,000 policy for each of us[,]" she and her husband "discussed it and decided the premium was so cheap it would be unwise to turn down the offer."  PSOF (doc. 36), exh. 2 (doc. 36-2) thereto (Weber Aff.) at 6, ¶ 4.

<u>Metropolitan Life Ins. Co.</u>, 256 F.Supp.2d 1023, 1028 (D.Ariz. 2003).   Several factors lead inescapably to this conclusion.

First of all, the "ADD POLICY WORKSHEET" pertaining to "Issuance & Administration[,]" naming Williams as the "[p]olicyholder," plainly states that the "policyholder" is the "Administrator[.]" DSOF (doc. 19), exh. C thereto at HLWSP00193. That Worksheet also specifies that Williams, not Hartford or an "Agent/Administrator," is to perform the following "[a]dministrative [f]unctions[:]"

- "[a]ll solicitation & sales activity[;]"

- "[i]ndividual billing, collection and accounting for premiums[;]"

- "[i]ssue certificates[,]" defined as "brochure/cert [sic](considered a solicitation material[)][;]"

- "[i]nitial contact with insureds at time of claim[;]" and

- "[v]erification of coverage to the Company Claim Office[.]"

<u>Id.</u>   Insofar as the claims procedure is concerned, Williams' Employee Handbook directs its employees to obtain claim forms from a Williams' "branch location" or Williams' "Corporate Office." PSOF (doc. 36), exh. 5 (doc. 36-2) thereto at 21.   These "administrative functions" go far beyond merely "facilitat[ing] the [policy's] availability[,]" and contribute to a finding that Williams abandoned its neutral employer role.   <u>See</u> <u>Pierson</u>, 2000 WL 1879895, at *6 (internal quotation marks and citations omitted). They show that Williams "exercised control over" the Hartford policy.

Further evidence of Williams' exercise of control over the Hartford policy is found in the "Special Risk Life & Health

Administrator's Guide" ("the Guide"), which Hartford "[i]ssued
to[]" Williams "to *assist . . . [Williams] in the administration*"
of Hartford's AD&D policy.  DSOF (doc. 19), exh. C thereto at
HLWSP00120-HLWSP00130; and at HLWSP00164-HLWSP00165 (emphasis
added).[11]  Hartford modified that Guide in accordance with
Williams' needs.  <u>Compare</u> <u>id.</u> at HLWSP00129-HLWSP00139 <u>with</u> <u>id.</u> at
HLWSP00164-HLWSP00179.  Like the policy worksheet, that Guide
unequivocally states that the AD&D policy is "[a]dministered by[]"
Williams.  <u>Id.</u> at HLWSP00164.  That Guide instructs Williams on a
host of administrative tasks such as enrolling employees in the
policy.  This is accomplished by Williams' employees "return[ing]"
their completed enrollment cards to Williams, not to Hartford.  <u>Id.</u>
at HLWSP00165.  It is then Williams' responsibility "to insure that
all the [referenced] information . . . has been filled in, and
. . . is correct[.]" <u>Id.</u>  Williams' Employee Handbook echoes this
procedure, advising employees to "return[]" their "completed
enrollment card" to the "employee's respective [Williams']
Personnel Department[]" -- again, not to Hartford.  PSOF (doc. 36),
exh. 5 thereto at 19.

That Handbook not only informs Williams' employees of the
availability of AD&D insurance and how to enroll, but it devotes
four and a half pages to that policy.  <u>Id.</u> at 18-22.  Hartford is
not mentioned anywhere in that section.  That, in combination with
the fact that, *inter alia*, employees returned their enrollment
cards to Williams and Williams initiated the claims process,
contribute to a finding that "an objectively reasonable employee

---

[11]     Hereinafter all references to this Guide will be only to the modified
Guide, and not also to Hartford's standard issue Guide.

would conclude" that Williams "made it appear" that the AD&D policy was "part and parcel of [Williams] own benefit package." See Pierson, 2000 WL 1879895, at *6.

In addition to its enrollment responsibilities, it fell to Williams to handle employees' requests for changes in coverage or beneficiaries. See DSOF (doc. 19), exh. C thereto at HLWSP00169-HLWSP00171. Consistent with this responsibility is the fact that, as the Guide explains, the policy is "[s]elf-[a]dministered" such that "information on individual insureds is *not* maintained by . . . Hartford." Id. at HLWSP00175 (emphasis added). The Guide also advises Williams how to proceed when it receives a "notification of a loss from an insured or an insured's beneficiary[.]" See id. at HLWSP00174-HLWSP00176. That Guide further informs Williams how to obtain "SUPPLIES OR SPECIAL REQUESTS" from Hartford. Id. at HLWSP00176. Interestingly, the Guide explicitly states that the policy "may be subject to ERISA[,]" a fact which neither party mentions. Id. at HLWSP00178.

To be sure, as plaintiff alludes to, the Proposed Plan states that Hartford's "administration and claims service teams provide ongoing support[.]" Id. at HLWSP00044. This statement is not sufficient, however, to overcome the evidence of Williams' extensive involvement in administering the policy as outlined in the preceding paragraphs. Not only that, "[a]cting as administrator of the benefit plan tends to show that the employer endorsed the plan." Alloco, 256 F.Supp.2d at 1029 (citing Sarraf v. Standard Ins. Co., 102 F.3d 991, 993 (9th Cir. 1996)).

Besides its administrative responsibilities, Williams, through a broker, negotiated the premium rates. In fact, in 2002 Hartford

agreed to lower rates for Williams "on the condition that [Williams] be willing to *resolicit* this coverage to [its] employees in an effort to bring enrollment up." <u>Id.</u> at HLWSP00056 (emphasis added). In 2000, 2001 and again in 2002, Williams also filed Form 5500, the "Annual Return/Report of Employee Benefit Plan" which the Department of Labor and the Internal Revenue Service require. <u>See</u> <u>id.</u>, exh. D thereto. In those forms, Williams identifies itself, as opposed to Hartford, as the "plan sponsor" and as the "plan administrator." <u>See</u>, <u>e.g.</u>, <u>id.</u> at HLWFE00001; and HLWFE00002.

The broad scope of Williams' administrative responsibilities, especially when coupled with Williams' other involvement with the policy, belies plaintiff's assertion that Williams "did [no]thing beyond offering Hartford . . . an opportunity to propose a voluntary life plan offering excess coverage for employees wishing to purchase  additional life insurance, and facilitate payment through voluntary payroll deductions." Resp. (Doc. 35) at 8:14-17 (citations omitted). Indeed, the policy underlying the no endorsement element of the safe harbor regulation, which "is to prevent situations where the employer is taking positions on behalf of, *or in connection with*, the insurer[]" would be thwarted by a finding here that Williams did not endorse the Hartford policy. <u>See</u> <u>Ames</u>, 515 F.Supp.2d at 1056 (citation omitted).

Recognizing that employer endorsement is a matter of degree,[12] on the record as presently constituted, the court finds that employer neutrality, the hallmark of the third safe harbor

---

[12]   <u>See</u> <u>Brundage</u>, 877 F.2d at 510 (contrasting an employer who "take[s] a few steps beyond" the safe harbor regulation, but "still remain[s] outside [its] scope" with "the other extreme" of an "employer who provides welfare benefits directly to its employees[]").

criteria, is missing here.  Viewing the record as a whole, it is clear that Williams did far more than "arrange for desirable coverage at attractive rates, serve as an honest broker, and remain neutral regarding the operation of [Hartford's] . . . insurance polic[y]."  See Rubin, 174 F.Supp.2d at 1118 (internal quotation marks omitted).  Consequently, the court finds that plaintiff Weber cannot avail herself of ERISA's safe harbor exemption so as to defeat Hartford's summary judgment motion.  The court's analysis cannot end here, however.  As explained earlier, the next issue is whether the Hartford policy is an "employee welfare benefit plan" within the meaning of ERISA. If it is not, plaintiff could, nonetheless, survive this summary judgment motion.

### 2.  *"Employee Welfare Benefit Plan"*

"State common law claims are preempted by ERISA 'insofar as they may now or hereafter relate to any employee benefit plan' regulated by ERISA."  Miller v. Rite Aid Corp., 504 F.3d 1102, 1105 (9th Cir. 2007) (quoting 29 U.S.C. § 1144(a)).  Thus, among other things, "ERISA preempts state law claims if such claims are brought as an attempt to recover benefits owed under a plan governed by ERISA."  Gelow, 2008 WL 436935, at *6 (citing, *inter alia*, Crull v. Gem Ins. Co., 58 F.3d 1386, 1390 (9th Cir. 1995)).  Therefore, because the safe harbor regulation does not apply here, if the Hartford policy is an "employee benefit plan" which ERISA governs, then section 1144(a) preempts plaintiff's state law claims.  See Gelow, 2008 WL 436935, at *5; see also Castiglione v. U.S. Life Ins. Co., 226 F.Supp.2d 1025, 1029 (D.Ariz. 2007) (citation omitted) ("If ERISA applies [to the parties' insurance dispute], it would preempt Plaintiffs' common law claims.")

"[T]he question of ERISA preemption is one of law[.]" <u>Gelow</u>, 2008 WL 436935, at *6 (citing <u>Waks v. Empire Blue Cross/Blue Shield</u>, 263 F.3d 872, 874 (9th Cir. 2001)).  The burden is on Hartford though, as the party asserting ERISA preemption as a federal defense, to "prove the facts necessary to establish it." <u>Kanne v. Connecticut Gen. Life Ins. Co.</u>, 867 F.2d 489, 492 n. 4 (9th Cir. 1988).  Similarly, "[t]he burden of establishing the existence of an ERISA plan is on [Hartford]."  <u>See</u> <u>Zavora</u>, 145 F.3d at 1120 n. 2 (citation omitted).

"The 'starting point in every case involving construction of a statute is the language itself.'" <u>Ordlock v. C.I.R.</u>, 2008 WL 2841156, at *3 (9th Cir. 2008) (quoting <u>Greyhound Corp. v. Mt. Hood Stages, Inc.</u>, 437 U.S. 322, 330, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978)).  Essentially, ERISA defines an "employee welfare benefit plan" as "(1) a plan, fund, or program (2) established or maintained (3) by an employer, . . . (4) for the purpose of providing . . . benefits in the event of death (5) to participants or their beneficiaries." <u>Pierson</u>, 2000 WL 1879895, at *5 (citing <u>Steen v. John Hancock Mut. Life Ins. Co.</u>, 106 F.3d 904, 917 (9th Cir. 1997)); <u>see</u> <u>also</u>  29 U.S.C. § 1002(1)(A) (West 1999).  In <u>Demars v. CIGNA Corporation</u>, 173 F.3d 443 (1st Cir. 1999), cited with approval by the Ninth Circuit in <u>Waks</u>, the First Circuit aptly stated that "[t]his nearly tautological definition offers little guidance." <u>Id.</u> at 445.  Despite the lack of guidance from the statute itself, with elucidation from case law, the court finds that the Hartford group AD&D policy constitutes an "employee welfare benefit plan" within the meaning of 29 U.S.C. § 1002(1). . . .

### a.  "Plan, Fund, or Program"

As the Ninth Circuit has astutely observed, "[t]he precise definition of a 'plan, fund, or program' is less than well defined[.]" Curtis v. Nevada Bonding Corp., 53 F.3d 1023, 1028 (9th Cir. 1995).  At a minimum, "[t]o qualify as an employee benefits plan, the accounts at issue must demonstrate an ongoing administrative structure and allow reasonable persons to identify and distinguish the plan's beneficiaries, intended benefits, funding source, and the procedures beneficiaries utilize to receive benefits." Gelow, 2008 WL 436935, at *6 (citing Winterrowd v. Am. Gen. Annuity Ins. Co., 321 F.3d 933, 938-39 (9th Cir. 2003)).  The Hartford policy easily satisfies these criteria.  Even a cursory review of that policy[13] shows that the "intended benefits" are for "Accidental Death and Dismemberment[.]" DOSF (doc. 19), exh. A thereto at HLAWSP00001 (emphasis in original).  Such a review likewise readily allows a reasonable person to "identify and distinguish the plan's beneficiaries" as "[a]ll full-time employees" of Williams and their "eligible dependents[.]" Id., exh. A thereto at HLAWSP00006 and HLAWSP00012.  The "funding source," as the policy reflects, is the premiums paid.  The policy also contains fairly comprehensive procedures for the receipt of benefits.  See id. at HLAWSP00034.  Based on the foregoing, the court finds that the Hartford policy is a "plan" as that term is used in 29 U.S.C. § 1002(1).

. . .

---

[13]   "The Policy is, . . . , excluded from the definition of hearsay and is admissible evidence because it is a legally operative document that defines the rights and liabilities of the parties in this case." Stuart v. UNUM Ins. Co. of America, 217 F.3d 1145, 1154 (9th Cir. 2000) (citations omitted).

1

### b.   "Established or Maintained"

2   "A program[,]" such as the Hartford policy, "that fails to

3   satisfy the [safe harbor] regulation's standards is not

4   automatically deemed to have been 'established or maintained' by

5   the employer, but, rather, is subject to further evaluation under

6   the conventional tests."   See Rubin, 174 F.Supp.2d at 1116

7   (internal quotation marks and  citation omitted).   The

8   "established or maintained" aspect of an employee welfare benefit

9   plan serves a discrete purpose; it is "designed to ensure that a

10   plan is part of the employment relationship."   Pierson, 2000 WL

11   1879895, at * 9 n. 62 (internal quotation marks and citations

12   omitted).   "Whether a plan is part of the employment relationship

13   in turn depends on whether the employer has engaged in a meaningful

14   degree of participation in the plan and whether the purchase of an

15   insurance policy constituted an expressed intention to provide

16   benefits on a regular and long-term basis."   Id. (internal

17   quotation marks and citations omitted).

18   As already explained, Williams did participate to a

19   "meaningful degree" in various aspects of the Hartford policy

20   ranging from negotiating premiums to performing a host of

21   administrative functions to being in charge of all solicitation and

22   sales activities.   The nature and scope of Williams' participation

23   easily persuades the court that that policy was part of Williams'

24   "employment relationship" with its employees, such that Williams

25   can be deemed to have "established or maintained" the Hartford

26   policy as section 1002(1) contemplates.

27   Bolstering this finding is the Ninth Circuit's recognition

28   that "[a]n employer . . . can establish an ERISA plan rather

easily." <u>Credit Managers Ass'n v. Kennesaw Life & Acc. Ins.</u>, 809

F.2d 617, 625 (9th Cir. 1987).  Therefore, "[e]ven if an employer

*does no more than arrange* for a 'group-type insurance plan,'" the

Ninth Circuit has indicated that the employer "can establish an

ERISA plan, unless [that employer] is a mere advertiser who makes

no contributions on behalf of its employees." <u>Id.</u> (citation

omitted).  By now it should be fairly self-evident that Williams'

role *vis-a-vis* the Hartford policy went far beyond that of a "mere

advertiser" who made no plan contributions.   Thus, the court is

convinced that there is more than sufficient proof on this record

to show that Williams "established or maintained" a plan.

### c.  *"By an Employer"*

ERISA defines an "employer" as "any person acting directly as

an employer or indirectly in the interests of an employer, in

relation to an employee benefit plan." 29 U.S.C. § 1002(5).  In

the present case, it is undisputed both that Hartford issued the

subject policy to Williams, and that Williams was Mr. Weber's

employer.  <u>See</u> DSOF (doc. 19) at 1, ¶1 (citation omitted); <u>See</u> PSOF

(doc. 49) at 2, ¶1.   Accordingly, the "employer" aspect of section

1002(1) is met on this record.

### d.  *"For the Purpose of Providing Employee Welfare Benefits"*

Clearly, the purpose of the policy was to provide employee

welfare benefits in that it offered coverage for accidental death

and dismemberment.  <u>See</u> <u>Castiglione</u>, 262 F.Supp.2d at 1029.

### e.  *"To Participants or their Beneficiaries"*

It is also readily apparent, as already explained, that the

policy offers benefits to "participants," *i.e.* full-time Williams'

employees who elect coverage under the policy, and their eligible dependents, hence satisfying the fifth aspect of an employee welfare benefit plan.

As the foregoing demonstrates, all five elements of an "employee welfare benefit plan" are met on this record. Thus, "[w]hile ordinarily '[t]he existence of an ERISA plan is a question of fact to be answered in light of all the surrounding facts and circumstances from the point of view of a reasonable person[,]' where, no genuine issues of material fact exist, as here, summary judgment should be granted." See Bellisario v. Lone Stare Life Ins., 871 F.supp. 374, 376 (C.D.Cal. 1994) (quoting Harper v. American Chambers Life Ins. Co., 898 F.2d 1432, 1433 (9th Cir. 1990)). In sum, the uncontroverted evidence demonstrates that the Hartford policy fits the statutory definition of an employee welfare benefit plan.

Plaintiff attempts to avoid this result, not by coming forth with "specific facts showing that there is a genuine issue for trial as to the existence of an ERISA plan, but, rather, by contending that the policy "is an [e]ntrepreneurial [p]lan[.]" Resp. (doc. 35) at 6:2. As such, plaintiff asserts that ERISA does not preempt the Hartford policy. With no analysis whatsoever, plaintiff relies exclusively upon Hamberlin v. VIP Insurance Trust, 434 F.Supp. 1196 (D.Ariz. 1977), to support this argument. The court agrees with Hartford though that Hamberlin is completely inapposite here, primarily because it is readily distinguishable on its facts.

In Hamberlin, after an insurance company notified a multi-employer trust that it was cancelling the group coverage, defendant

insurance brokers established a new self-funded trust and acted as an administrator for a commission.  In holding that the defendant trust did not qualify as an ERISA employee benefit plan, the court explained that the trust "was purely an entrepreneurial plan put together by [the insurance brokers] to protect business commissions they would have lost if the trust had not been restructured and continued after [the insurer] cancelled."  Hamberlin, 434 F.Supp. at 1198.  The court further explained that creation of the new trust allowed the brokers to "maintain[] business relations with customers they could have lost."  Id.  What was "[m]ost important[]" to the court's holding, however, was that the new trust, which was "designat[ed] [as] an ERISA plan,"  was created "in the hope[] [of] escap[ing] from direct supervision and auditing by the State Insurance Department and from its coverage and reserve requirements under the theory of federal preemption."  Id.  The court went on to note the "substantial national concern over the increase in the numbers of uninsured multiple employer trusts such as this which have avoided state supervision and have failed, leaving sick or injured employees holding an empty bag."  Id. at 1198-99 (citation and footnote omitted).

Clearly the present case does not raise similar policy concerns in that the Hartford policy is a fully insured, single employer plan, with significant involvement by the employer, in sharp contrast to Hamberlin.  Furthermore, the Hartford policy was not designed to avoid state regulation, such as the trust at issue in Hamberlin.  The court simply fails to see how Hamberlin has any bearing upon the present case.  Thus, it abides by its finding that the Hartford policy is a plan subject to ERISA preemption.  Having

found that plaintiff is not entitled to invoke the protections of ERISA's safe harbor regulation, and having further found that the Hartford policy is an employee welfare benefit plan governed by ERISA, the court necessarily finds that ERISA preempts plaintiff's state law causes of action.  Accordingly, defendant is entitled to summary judgment as to those causes of action.

### III.  Cross-Motion to Amend

Evidently attempting to cover all of her bases, plaintiff purports to be "cross-moving for summary judgment on defendant's motion to dismiss[.][14]" Resp. (doc. 35) at 9:18-19 (footnote added).  Close examination of this aspect of plaintiff's response shows that what she actually is seeking is denial of defendant's motion.  Obviously, the court will not be granting that relief having found that summary judgment in favor of the defendant is proper here.

Finally, in accordance with this court's prior scheduling order, the parties have thirty (30) days from the date of entry of this order in which "to amend the[ir] pleadings to add an ERISA claim, [and] any other claims or defenses, [and] [to] bring in such additional parties as a party deems may be reasonably necessary[.]" Order (doc. 14) at 3:19-21.

For the reasons set forth herein, the court hereby ORDERS:

(1) that plaintiff's "Motion to Strike Defendant's Evidence Supporting Motion for Summary Judgment" (doc. 39) is DENIED; and

(2) that defendant's "Motion for Summary Judgment on Grounds

---

[14]     Plaintiff is improperly characterizing defendant's motion.  Plainly it is not a motion to dismiss pursuant to Fed. R. Civ. P. 12, but rather a summary judgment motion in accordance with Fed. R. Civ. P. 56.

of ERISA Preemption" (doc. 18) is GRANTED; and

(3) the parties have thirty (30) days from the date of entry of this order in which to amend the pleadings to add an ERISA claim, and any other claims or defenses, and [to] bring in such additional parties as a party deems may be reasonably necessary.

IT IS ORDERED.

DATED this 22nd day of August, 2008.

_____
Robert C. Broomfield
Senior United States District Judge

Copies to all counsel of record